UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| RAUL RUIZ, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:12-CV-407 |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| PROTECTIVE AND REGULATORY | § | |
| SERVICES, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER

Texas Ruiz (Texas), an 18-month-old child, died from brutal injuries suffered while in the care of his mother and her boyfriend. Texas' father, Raul Ruiz (Ruiz), has brought this action on his own behalf and on behalf of Texas against Eva Cadena (Cadena) and Angela Arredondo (Arredondo), two social workers. Cadena and Arredondo, employees of the Texas Department of Protective and Regulatory Services (TDPRS),[1] were involved in the investigation of child abuse allegations and the placement of Texas with relatives during the last six months of his life—a placement that proved ineffective in preventing Lorraine Rodriguez (Mother) from taking Texas back to her home, unsupervised, at the time of the incidents leading to his death.

Through 42 U.S.C. § 1983, Ruiz seeks damages for alleged constitutional violations, including deliberate indifference to a substantial and known risk of harm to Texas, failure to intervene to prevent injuries, depriving Ruiz and Texas of their right to

---

[1] Ruiz dismissed the Texas Department of Protective and Regulatory Services as a separate defendant on May 10, 2013. D.E. 14.

family integrity, failure to protect based on a "special relationship," and "state created danger."  D.E. 34, p. 4.  Cadena and Arredondo have filed an Amended Motion to Dismiss (D.E. 35) and a Motion for Summary Judgment (D.E. 40), arguing that Ruiz has not stated a viable claim against them and that they are entitled to qualified immunity from suit.

This Court is thus called upon to determine whether the tragic facts of this case cross the lines that have been developed in too many cases that have preceded this one, seeking to balance the rights of parents to raise their children in privacy against the responsibilities of the state to intervene when children appear to be in danger.  This is an emotionally-charged arena with obviously high stakes.  It also concerns issues that are not always clear as the events unfold in real time, making hindsight an inappropriate method for decision-making.  Against this backdrop, this Court is duty-bound to make a dispassionate determination of whether the facts of this case amount to constitutional violations such that legal blame falls at the feet of Cadena and Arredondo.

As detailed below, the Court finds that Ruiz has not stated claims upon which relief may be granted with respect to the Fourth Amendment and the Fourteenth Amendment theories of "special relationship" and "state-created danger" and that the allegations are insufficient to defeat the Defendants' affirmative defense of qualified immunity.  The Second Amended Motion to Dismiss (D.E. 35) is GRANTED.  Additionally, because the Court finds that the constitutional rights on which this case is predicated do not apply to the facts or were not "clearly established" so as to put the caseworkers on notice that their actions violated the constitution, qualified immunity

protects Cadena and Arredondo and their Motion for Summary Judgment (D.E. 40) is GRANTED.  This action is thus DISMISSED in its entirety.

## FACTS

Ruiz has tendered to the Court TDPRS records of its investigation on behalf of Texas, along with Arredondo's trial testimony from the criminal trial of Mother's boyfriend J.J. Garza (Garza).  The salient portions of the TDPRS record reflect that TDPRS received a referral from Texas' daycare worker on June 24, 2010, regarding bruising to Texas' face, head, thigh, and buttocks, along with odd behavior—putting his hands in front of his face when speaking.

There was no prior history between TDPRS and Texas or his mother.  Mother claimed that she lived alone with Texas and explained the apparent injuries as the result of mosquito bites and a prior fall from some bleachers.  After initial refusals, Mother agreed to take Texas to Driscoll Children's Hospital for evaluation and observation.  The doctor opined that the injuries were inflicted—not mosquito bites or the result of a fall.

The TDPRS investigation found that Garza did live with Mother despite her previous denials.  The maternal grandmother confirmed that she had seen bruises on Texas' buttocks within the same general time frame as his other bruises and had questioned Mother about them.  The maternal grandmother, with Mother's consent, agreed to have Texas placed with her and to allow Mother only supervised visits.

Arredondo's subsequent monthly visit to the maternal grandmother's home on July 29, 2010, indicated that Mother was not visiting Texas much, but that the father, Ruiz, had picked up Texas for his designated weekend visitations and that Texas always

returned from those visits clean and happy.  A visit to the daycare on that same day indicated that the daycare staff had no concerns.  They reported that the maternal grandmother would drop off and pick up Texas, who was clean, ate well (although in a messy fashion), and had no visible signs of abuse.  The only concern was an apparent diaper rash that was not healing, so measures were taken to address that with Mother and maternal grandmother.

The next day, Arredondo met with Mother and Garza.  The two were not happy about the outcome of the initial investigation finding "reason to believe" neglect or abuse had occurred.  They wanted to appeal the finding.  At that time, Mother was considered cooperative and anxious to comply with the TDPRS plan and regain possession of Texas.  Because of a risk of future abuse, Mother was asked to, and did agree to, attend individual counseling (because of her experience with domestic violence[2]) and parenting classes.  Garza also reluctantly agreed to go to parenting classes.  At that time, Mother asked that Texas be placed with the maternal grandfather because the maternal grandmother was allowing Ruiz unscheduled visits.

The next month, on August 30, 2010, Arredondo met with Mother again.  Mother asked again that Texas be placed with the maternal grandfather because his home was closer to hers and she was not on speaking terms with the maternal grandmother.  She had upgraded her apartment to a two-bedroom in order to have appropriate sleeping space for Texas when she regained possession.  On that same date, daycare workers reported

---

[2]   The TDPRS Evaluation indicates that Mother admitted to being abused in one unreported incident when she lived with Ruiz.  D.E. 49-2, pp. 10, 62.

that Texas was still dropped off and picked up by his maternal grandmother, was doing "wonderful," played well with others, appeared to be developing on track, and had no visible signs of abuse or neglect.  Their only concern was an apparent delay in his speech development.  Also, he cried for unknown reasons when his mother came to visit.

On September 14, 2010, Mother appeared at TDPRS offices wanting to appeal the results of the TDPRS investigation.  Mother also reported that Texas had a diaper rash that she thought was the fault of daycare and that he had bruising down his back that the maternal grandmother had explained as the result of a fall down stairs.  Mother reiterated her desire to change Texas' placement to the maternal grandfather and Arredondo explained that she was still doing her investigation into his home situation to determine whether placement there was appropriate.

That day, as a result of Mother's complaints, Arredondo went to Texas' daycare for a visit.  Texas appeared clean, appropriately dressed, and in good spirits.  His speech was greatly improved.  He was suffering from a diaper rash, but it was not as severe as Mother had reported, and there were no visible bruises on his back.  The only bruises were on his arms, which the daycare staff reported were the result of a peer who went on a "biting frenzy."

On September 21, 2010, Arredondo conducted a home visit with the maternal grandfather.  He questioned the need to supervise Mother's visits, and Arredondo explained the results of the TDPRS investigation and risk of future abuse, with the goal of eliminating those risks and reuniting the family.  The maternal grandfather agreed to the safety plan provided to him.  On September 23, 2010, Mother agreed to the new

safety plan placing Texas with the maternal grandfather and the new placement was thereafter completed.  Mother had, by September 30, 2010, initiated and actively engaged in recommended services with Gulf Coast Rehab Services.

On October 1, 2010, the maternal step-grandfather called TDPRS and spoke to Cadena, expressing his concern that Texas was not being cared for by the maternal grandfather but was actually in the care of a 17-year-old uncle because of the maternal grandfather's work schedule.  Arredondo explained to Cadena that she was aware of the work schedule and the uncle's participation in Texas' care.  All of the individuals living at that address had passed the necessary background check and the arrangement was deemed appropriate for Texas.

On October 8, 2010, Ruiz contacted Cadena to complain about the change in Texas' placement and being left "out of the loop."  Cadena explained that Ruiz needed to communicate with Mother, who had primary custody of Texas, and that TDPRS was not responsible for being messengers between them.  Ruiz stated that he would hire a lawyer and hung up on Cadena while she was still speaking.

On October 11, 2010, Mother reported that Ruiz had threatened her at her place of employment and came to her apartment, irate.  He pounded on her door, damaging it. She called the police.  When Ruiz left, she also left the premises out of fear for her safety, just as the police pulled up.  No police report was filed.  After Mother's call reporting this information, Arredondo attempted to meet with Mother at her apartment, but no one answered.  Arredondo then went to the daycare to see Texas.  He had facial bruises and a deep scratch.  He also had what looked like bruising or a healing diaper rash.

Arredondo took photographs of these apparent injuries and reviewed them with Cadena.  That afternoon, they called in a new report of abuse and a new investigator was assigned to the case.  He was instructed to locate Mother, inform her of the new allegations and confront her and the maternal grandfather about the injuries and request that Texas be taken to Driscoll Children's Hospital for evaluation.  He and Arredondo went to the maternal grandfather's house and he was not home.  They went to Mother's house.  She was not home and her phone was off.  They went to the daycare and learned that Mother had just picked up Texas.  They went back to the maternal grandfather's home and still no one was there.

The subsequent investigation indicated that both Ruiz and Mother had permitted the injuries to Texas because both had observed them and failed to act to report or prevent them or otherwise protect Texas.  D.E. 49-2, pp. 40-41.  On October 12, 2010, Arredondo and the investigator met with Mother and maternal grandfather at the latter's home.  Mother claimed that the facial issues were mosquito bites and that she had taken Texas to a doctor, who had prescribed a cream for treatment.  She said that Texas' diaper rash had improved once the daycare was providing logs of diaper changes.  The investigator informed the maternal grandfather that TDPRS wanted him to take Texas to Driscoll Children's Hospital for evaluation and he agreed.  On October 13, 2010, Driscoll Children's Hospital confirmed that the facial bruising was an allergic reaction to mosquito bites.

On November 5, 2010, Arredondo learned that Texas had been admitted to Driscoll Children's Hospital the day before because of "an old subdural hematoma." The Emergency Room staff and the pediatric neurologist had ruled out abuse. Texas underwent surgery and other doctors reviewed the case, but they could not state that the hematoma was the result of abuse or neglect. Ten days later, Arredondo spoke with the maternal grandfather, who reported that Texas had recovered well and was running around and playing as if nothing had happened. Another TDPRS worker attempted a face-to-face contact with Texas and Mother on November 16, 17, and 29, but no one ever answered the door.

On the morning of November 29, 2010, Arredondo learned that Texas was no longer at the daycare as services had been terminated due to too many absences. Later that morning, Arredondo went to the maternal grandfather's home to see Texas and was informed that Texas was with Mother. He admitted that he had broken the safety plan by allowing Mother unsupervised care of Texas, but he said it was only that one night because he had to work a double shift. Arredondo immediately tried to locate Mother, but she was not at her home, her cell phone was disconnected, and she was not at work.

On December 9, 2010, Arredondo again tried to visit Mother at her home. She could hear movement within the home. She heard the lock on the door turn, but no one opened the door despite several knocks. On December 16, 2010, Texas was seen by his physicians for a follow-up from the November surgery. On December 20, 2010, Arredondo sent Mother an appointment letter through certified mail requesting that she

be available on December 27, 2010.  On the day of the appointment, Mother called Arredondo and left a message canceling and saying that she would call to reschedule.

On January 1, 2011, at 3:03 a.m., Texas was pronounced dead at Driscoll Children's Hospital.  Mother claimed that she was alone with Texas and that he had fallen from a kitchen counter when she reached for a package of cookies for him.  But Texas' injuries were not consistent with that explanation.  It was later determined that Garza was in the home at the time.  The cause of death was multiple blunt force injuries of the head and abdomen and was ruled a homicide.

## PROCEDURAL POSTURE

Defendants Cadena and Arredondo seek dismissal of this case under Fed. R. Civ. P. 12(b)(6), arguing that the Complaint (D.E. 34) fails to state a claim upon which relief can be granted.  The test of pleadings under Rule 12(b)(6) is devised to balance a party's right to redress against the interests of all parties and the court in minimizing expenditure of time, money, and resources when a claim is insufficient to justify further proceedings. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1966 (2007).  *See also*, *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009).

The pleader must demonstrate that the facts of the case are sufficient to support the necessary findings behind each claim made.  He cannot rest on "labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 127 S.Ct. at 1964-65 (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932 (1986)).  The Court must determine whether the alleged facts "fit" the constitutional claims asserted.

Defendants have also filed their Motion for Summary Judgment (D.E. 40) raising the same issues as were briefed in their Motion to Dismiss, invoking the procedural advantage of the shift of the burden of proof in the adjudication of summary judgment motions on qualified immunity.  D.E. 40, p. 2.  Qualified immunity protects government employees against civil liability in their individual capacity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[3]  *Wernecke v. Garcia*, 591 F.3d 386, 392 (5th Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)) (internal quotation marks omitted).  It is a well-settled method for striking a balance between competing social objectives, providing breathing space for the vigorous exercise of official authority, while at the same time allowing a possibility of redress for victims of officials' abuses.  *Kinney v. Weaver*, 367 F.3d 337, 349 (5th Cir. 2004) (citing *Butz v. Economou*, 438 U.S. 478, 524, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)).

The qualified immunity defense raises a preliminary question of whether Arredondo and Cadena may be charged with violating a constitutional right that was so clear that no reasonable social worker would have engaged in the actions or omissions alleged.

> Once a defendant pleads a defense of qualified immunity, "[o]n summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether

---

[3]   "Even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity if the conduct was objectively reasonable."  *Zarnow v. City of Wichita Falls*, 500 F.3d 401, 408 (5th Cir. 2007) (quoting *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990)).  The Defendants' Motions do not address this additional burden that Ruiz must overcome in order to prevail against them.  Because the Court finds that the case does not present a clearly established constitutional right in the first part of its analysis, it need not reach the second, "objectively reasonable" conduct, element.

> that law was clearly established at the time an action
> occurred. . . . Until this threshold immunity question is
> resolved, discovery should not be allowed."

*Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 1793 (1991) (quoting *Harlow,*

*supra*).  In sum, qualified immunity protects "all but the plainly incompetent or those

who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Both Motions are sharply focused on whether the allegations pled or the facts

illustrated in the summary judgment evidence outlined above involve a violation of a

constitutional right.  To survive the Motions, there must be a constitutional right, it must

apply to the circumstances, and its parameters must be "clearly established" such that all

caseworkers would know where the line between lawful and unlawful conduct lies.  The

Court looks to Ruiz's live pleading to determine his theory of the case and the particular

constitutional violations at issue.

## THE PLEADING

The fact section of Ruiz's Second Amended Complaint, providing his version of

the events, is fairly brief and is set out here in its entirety:

> 5.      In July of 2010, the [TDPRS] was contacted by a daycare
> concerning significant signs of abuse to Texas, the deceased
> minor child. Thereafter, [TDPRS] initiated an investigation, and
> found after uncovering numerous lies and varying "stories" of
> how such injuries could have occurred, there was a reason to
> believe that Texas' mother Lorraine Rodriguez (hereinafter
> referred to as Mother) and Mother's boyfriend J.J. Garza
> (hereinafter referred to as "Garza") had caused such injuries upon
> Texas. As a result, Defendants created a safety plan whereby
> Texas would be in the care of his maternal grandmother and that
> Mother and Garza would not be allowed any unsupervised visits
> with Texas. At no time was Plaintiff contacted regarding his son
> and he was never considered for placement, despite his numerous

attempts to be so. Defendants actually prevented Plaintiff from any kind of contact or visitation with his son.

6. Thereafter, Defendants allowed Mother, with little or no reason, to have Texas transferred to the care of her father. Of course, such was a ruse and Defendants NEVER saw Texas at the grandfather's residence, and believed Texas was truly in the care of MOTHER and eventually found out months before Texas' death that Texas was not - and probably never was - in the care of the grandfather, that he had been removed by Mother and was not attending daycare. Despite such and the fact that Texas had during this time period been admitted to the hospital on multiple occasions for varying injuries, Defendants, despite knowing that Texas was in serious danger and in the care of persons who were violating protective agreements and/or had not completed any classes mandated as part of the protective plan - to maintain the "care" of Texas. And after securing such knowledge, what did Defendants do? Nothing. Despite not actually having seen the child for months and even after an additional hospital stay for a sub-dural hematoma, Defendants did not make contact with Mother, did not take any legal action to remove the child despite several visits where persons were heard to "lock" the door but refused to open up, and never contacted Plaintiff or considered him for placement of his son. Instead, Defendants merely wrote a letter directing Mother (but not Garza) to meet with them on December 27th. Not surprisingly, Mother cancelled said appointment via a phone message the day before and no other appointments were set and/or visits initiated. Basically, Defendants then did nothing further, simply ignored the continuing pleas from Plaintiff about his son's welfare and just waited for the inevitable phone call that Texas had been brought to Driscoll Children's Hospital unresponsive and dead due to a vicious beating at the hands of Mother and/or Garza. And come it did. Texas died January 1, 2011.

D.E. 34, pp. 2-3.

To make a claim under the Civil Rights Act of 1871, 42 U.S.C. § 1983, the statute provides that the defendant must be a person "acting under color of state law" in subjecting the plaintiff to a deprivation of any laws, privileges, or immunities secured by

the United States Constitution.  *Doe v. Covington County School Dist.*, 675 F.3d 849, 854 (5th Cir. 2012) (*en banc*).  Cadena and Arredondo do not dispute that, as employees of TDPRS they were "acting under color of state law."  At the same time, however, social workers are generally entitled to invoke the qualified immunity defense for actions taken during the course of investigating allegations of child abuse.  *Hodorowski, supra*; *Roe v. Texas Department of Protective and Regulatory Services*, 299 F.3d 395, 400 (5th Cir. 2002); *Doe v. State of Louisiana*, 2 F.3d 1412, 1416 (5th Cir. 1993); *Kiser v. Garrett*, 67 F.3d 1166, 1173 (5th Cir. 1995).

What is at issue here is whether the pleading states a viable constitutional deprivation.  It refers to the Fourth and Fourteenth Amendments to the United States Constitution, including substantive due process, specifically complaining of Defendants' conduct:

> a) by acting with deliberate indifference to a substantial and known risk of harm to Texas;
>
> b) by failing to intervene, where such intervention would have prevented the injuries to Texas;
>
> c) by depriving Plaintiff and/or Texas of their right to family integrity;
>
> d) by failing to protect Texas, who was in a "special relationship" with Defendants and his inability to care for himself; and
>
> e) in creating a "state-created" danger, which otherwise would not have existed, but for the conduct of Defendants, and which made more likely the opportunity of harm to occur to Texas.

D.E. 34, p. 4.  Each of these claims of constitutional violations are discussed below.

The Fourth Amendment claim stands on its own, challenging Cadena and Arredondo's conduct on "unreasonable search and seizure" grounds and will be addressed first.  The five itemized issues are all tied to the Fourteenth Amendment's substantive due process guarantee.  *See e.g.*,   *Hernandez v. Texas Department of Protective and Regulatory Services*, 380 F.3d 872, 880 (5th Cir. 2004) (deliberate indifference); *Walton v. Alexander*, 44 F.3d 1297, 1300 (5th Cir. 1995) (failure to protect); *Doe v. Covington, supra* at 864 n.9, 876 (special relationship, state-created danger); *Morris v. Dearborne*, 181 F.3d 657, 665 (5th Cir. 1999) (family integrity).

Because the injuries to Texas were not inflicted by Defendants but were perpetrated by private parties (Mother and/or Garza), Ruiz must show that he and Texas were within the scope of the substantive due process guarantee through a "special relationship" or "state-created danger" analysis before the duties associated with "deliberate indifference" and "failure to protect" are triggered against the state actors.  As detailed below, because the Court finds that the case does not survive the "special relationship" and "state-created danger" analyses that create a duty, the Court does not reach the "deliberate indifference" and "failure to protect" issues that provide the rubric for determining whether the duty was breached.

Last, Ruiz does articulate a cognizable right to "family integrity."  However, as detailed below, that right is insufficient to sustain this action when juxtaposed against the qualified immunity "clearly established law" requirement.  Each of the parties' arguments regarding (1) the Fourth Amendment, (2) Fourteenth Amendment, (a) special relationship, (b) state-created danger, and (c) family integrity will be addressed in turn.

## THE ALLEGED CONSTITUTIONAL VIOLATIONS

### 1.  Fourth Amendment:  Unreasonable Search and Seizure

The Fourth Amendment protects persons from unreasonable search and seizure. Ruiz has not articulated the basis of his claim under the Fourth Amendment, but it is generally applied in child endangerment cases to prevent authorities from entering a home and seizing the child without probable cause to believe that the child is abused and/or neglected.  *E.g., Wooley v. City of Baton Rouge*, 211 F.3d 913, 924-25 (5th Cir. 2000).  In assessing the reasonableness of a search or seizure, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *Id*. at 925 (citing *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637 (1983) and other Supreme Court opinions).  In this case, Ruiz pled that he "and/or" Texas was deprived of this Fourth Amendment right.

There is nothing in his pleading, however, to reflect that Ruiz, himself, was present, that any Defendant entered his home or property, or that they seized him by arrest or detention.  As he did not have custody of Texas, any seizure of Texas did not invade Ruiz's Fourth Amendment rights.  Ruiz does suggest that Texas should have been placed with him after Mother was deemed a threat to his safety.

The only authority upon which Ruiz relies for any Fourth Amendment claim is *Gates v. Texas Department of Protective and Regulatory Services*, 537 F.3d 404 (5th Cir. 2008).  That opinion stands for the proposition that a child should not be seized from a parent absent court order, parental consent, or exigent circumstances.  *Id*. at 420-22.  Yet,

15 / 32

if he was "seized" at all, Texas was seized from Mother under admittedly exigent circumstances.  In fact, Ruiz apparently applauds the intervention between Mother and Texas.

There is no suggestion in the pleading that Ruiz shared the home or was entitled to legal custody of Texas at the time of Defendants' intervention.  Ruiz has supplied no authority for the proposition that the Fourth Amendment mandates that a seized child be summarily placed with a parent who did not have the right to custody of the child's person at the time of the seizure.  In other words, there is no known affirmative duty expressed in the Fourth Amendment for specific handling of a seized person, once that seizure has been accomplished.  Ruiz does not allege facts or supply authority to support recovery in his own name for any Fourth Amendment violation.

With respect to Texas' Fourth Amendment rights, the factual allegations and the summary judgment evidence do reflect that Texas was voluntarily placed first with Texas' maternal grandmother and later with Texas' maternal grandfather.  The pleading clearly alleges that the facts not only justified a placement away from Mother, but contends that Defendants should have done more to keep Texas away from the home environment that presented a threat to his safety.  Rather than pleading an "unreasonable" search and seizure, the Complaint alleges facts wholly consistent with the reasonableness of a seizure, if one occurred.  Thus it does not express a Fourth Amendment claim on behalf of Texas.

The Court **GRANTS** the Defendants' Second Amended Motion to Dismiss (D.E. 35) with respect to the Fourth Amendment claims asserted on behalf of both Ruiz and Texas.

### 2.  Fourteenth Amendment:  Substantive Due Process

#### a.  Special Relationship

According to the factual allegations of this lawsuit and the summary judgment evidence, the injuries that Texas suffered were suffered at the hands of Mother and/or Garza—private actors.  Generally speaking, "[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 197 (1989).  The "special relationship" doctrine arises out of a Fourteenth Amendment substantive due process analysis, carving out exceptions to the general rule for circumstances under which the state may be responsible for injuries inflicted by private actors.

The purpose of the Due Process Clause "was to protect the people from the State, not to ensure that the State protected them from each other."  *Id*. at 196.  As indicated, this general rule is subject to an exception where a duty arises out of certain "special relationships" created or assumed by the State.  *Id*. at 197.  The *DeShaney* case has defined the "special relationship" doctrine in a way that prevents its application to the scenario here, where the child was injured by his own parent—even while the risk of abuse was on the State's radar.  The parties disagree on the application of the holding in *DeShaney*, so the case will be discussed at some length.

17 / 32

In *DeShaney*, a case all too similar to the one before this Court, the authorities were aware that the child was at risk of abuse at the hands of his own father, but felt that they had insufficient evidence to retain the child in the custody of the court to the exclusion of the father.  So they had instituted a number of protective measures, including enrolling the child in a preschool program, providing the father with counseling services, and entering into an agreement with the father to cooperate toward voluntary goals.  Still, the child ended up in the emergency room on a number of additional occasions and the father then refused to allow the caseworker to see the child.  It was when the child fell into a life-threatening coma (two years and three months after the State became involved) that emergency brain surgery revealed a series of traumatic head injuries inflicted over a long period of time.  The child survived, but suffered brain damage so severe that he would require institutionalized care the rest of his life.

The *DeShaney* child's mother sued, alleging that the caseworkers knew or should have known that the child was at extreme risk and should have intervened to better protect him from his father.  The fact that the caseworkers had intervened at all with the intention of protecting the child from his dangerous father was used to support the argument that, upon embarking on that path, they should have taken that path to its necessary end:  removing the child from the father's reach.  *Id*. at 197.

The Supreme Court disagreed, noting that the only established "special relationships" arise when the State takes exclusive custody of (1) a prisoner or (2) an involuntarily committed mental patient, as both types of individuals are rendered incapable of acting for their own benefit ***because*** the State has taken custody of them.  *Id*.

18 / 32

at 199-200.  "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."  *Id*. at 200.  In other words, no "special relationship" exists until the individual is taken into the state's exclusive custody.  *See generally, Doe v. Covington County School District, supra* at 857-59 (explaining the significance of exclusive or "against their will" custody or "total restriction" in recognizing the special relationship).

After *DeShaney*, the Fifth Circuit acknowledged that a child placed in foster care to the exclusion of the parents' right of possession is a third "special relationship" exception.  *Griffith v. Johnston*, 899 F.2d 1427, 1439 (5th Cir. 1990).  However, that does not encompass the argument here that temporary removal of the child triggered a special relationship even after the parent regained possession.  In fact, the *Griffith* opinion specifically recites the *DeShaney* conclusion that when the child is returned to his parents, any special relationship with the State ends, despite any ongoing concern for the child's safety.  For this reason, Ruiz's request for discovery to better reveal whether the State "removed" Texas such that it had created a special relationship is moot because Texas was in Mother's possession rather than in any State custody when the injuries occurred.

The *DeShaney* opinion considered and addressed the argument that arises from the gap between a parent's undisturbed possession and the state's exclusive possession in the form of foster care—that time during which the state is investigating and seeking a mutually beneficial solution to apparent risks of abuse and neglect without going so far as

to take exclusive possession of the child.   The argument raised regarding this "investigation gap" is that a child cannot act on his own behalf and, exercising some control over the child—albeit temporarily—still creates a "special relationship."  In fact, the dissenting opinion in *DeShaney* would have recognized this as another "special relationship" exception to the general rule.  *Id*. at 206-10 (Brennan, J., dissenting).

The reasoning for this additional exception to the "no duty to protect from private actors" rule, according to Justice Brennan, is that the child's community, which might otherwise act with vigilance to protect the child, relaxes its efforts in reliance upon the State's power to act definitively once it has received the complaints.  Thus, the "system" puts the State in charge from the time the investigation is initiated, whether or not the charges are ultimately substantiated and are so egregious as to mandate removal.  However, the majority of the Supreme Court rejected that argument.  In particular, the Court stated:

> Petitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor.  While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.  ***That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody***, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.  Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id*. at 201 (emphasis added).  While rejecting a constitutional claim, the majority of the Supreme Court did suggest that the State's action in voluntarily undertaking to protect the child might subject it to liability under state tort law for failing to provide adequate protection against the known danger.  But Ruiz has raised no state tort law claims in the case before this Court.

Ruiz seeks to distinguish *DeShaney*, arguing that the State did not have custody of the *DeShaney* child and the Fifth Circuit has recognized that when the TDPRS takes a child into state custody, it creates that third "special relationship," citing *Hernandez v. Texas Department of Protective and Regulatory Services*, 380 F.3d 872 (5th Cir. 2004). This argument fails to support a remedy here for two reasons.  First, in *Hernandez*, the harm was actually inflicted by the foster parents who were selected by the State to serve as custodians to the exclusion of the biological parent.  The foster placement "special relationship" recognized under these circumstances depends upon the child remaining in that non-parental custody—a scenario that puts *Hernandez* in a class separate from *DeShaney* and this case.

Second, this Court sees no material difference between the facts of *DeShaney* (the State "returning" the child to an abusive parent) and the facts here, Mother retaining legal custody, but agreeing to have Texas placed with a relative who, contrary to the agreed

safety plan and the State's intention, allows the child to return to that abusive parent.[4]
Indeed, the *DeShaney* fact scenario would supply a better argument against the
caseworkers than do the facts here because the *DeShaney* caseworkers apparently acted to
directly place the child back in the hands of the dangerous parent.  Here, the caseworkers
did make some effort to keep the child from the unsupervised custody of the abusive
parent; the return of the child was indirect and unintended.  Either way, however, the
child started in the abusive parent's custody and was in that same parent's custody when
that parent inflicted harm.  The Supreme Court has decided that such a scenario does not
raise a substantive due process claim under the United States Constitution.

It is the Supreme Court's prerogative to draw the line where inadvertence,
negligence, or even gross negligence ends and a constitutional violation begins.  It has
drawn that line in a divided opinion where the argument in Ruiz's favor was squarely
considered and did not prevail.  It is not this Court's place to move that line.  The Court
GRANTS the Defendants' Second Amended Motion to Dismiss (D.E. 35) and GRANTS
the Defendants' Motion for Summary Judgment (D.E. 40) with respect to Ruiz's
allegations of a violation of Fourteenth Amendment substantive due process rights by

---

[4]   Ruiz tries to make the manner in which Mother obtained custody of Texas an issue, alleging that Texas was
"kidnapped" by Mother from the State's control.  D.E. 29, p. 5.  However, the placement at issue was done pursuant
to Mother's "voluntary agreement," which recited that "there is no court involvement with this child."  D.E. 35-1.
*See also* D.E. 35-2.
      Ruiz suggests that he should be permitted to conduct discovery regarding the extent of the State's control over
Texas' placement and challenges any reliance on the documentary evidence provided with the Motion.  No
discovery is necessary, however.  The Court need not rely on the documents offered with the Amended Motion to
Dismiss because Ruiz has not alleged any basis by which the State had custody of Texas to the exclusion of Mother.
There is no fact issue to determine in that regard.  Furthermore, Ruiz includes in his response references to trial
testimony in the criminal action taken against Garza that no legal action had been taken with respect to Texas'
custody that would defeat Mother's rights.  D.E. 29, p. 6 (referring to D.E. 29-1, p. 87).

way of a "special relationship."   No special relationship existed so as to require Arredondo and Cadena to prevent the harm caused by private actors, Mother and Garza.

### b. State-Created Danger

Another theory that grows out of the nature of substantive due process rights conferred by the Fourteenth Amendment is the "state-created danger" theory.   This theory is based on the concept that the State has a duty to protect when its own intervention in events had an active role subjecting an individual to a danger that would not otherwise have affected him.   The Fifth Circuit has recognized that other Circuits have applied a state-created danger theory in the following contexts:   (1) an undercover operative was shot while working for the police; (2) city officials released personnel files of the investigating officers to the drug conspirators that they were investigating; (3) police officers stopped a clearly intoxicated woman and then left her alone to walk home on a cold night; (4) a mental hospital patient killed an activity therapist on the job; (5) motorists were injured by a drunk driver who had not been arrested when stopped by police; (6) police officers conspired with a group of "skinheads" to assault demonstrators; (7) police chief instructed his officers to ignore a woman's pleas for assistance when her estranged husband came to kill her; (8) a town clerk was abducted and terrorized by prison inmates during a community work program; and (9) a passenger in a car was abandoned on the side of the road and raped after officers impounded the vehicle in which she had been riding.  *McClendon v. City of Columbia*, 305 F.3d 314, 325 n.6 (5th Cir. 2002) (*per curiam; en banc*).

As a result, the Fifth Circuit articulated the state-created danger claim as arising when "the defendants used their authority to create a dangerous environment for the plaintiff and [] the defendants acted with deliberate indifference to the plight of the plaintiff." *Scanlan v. Texas A&M University*, 343 F.3d 533, 537-38 (5th Cir. 2003). The defendants must have created the environment for danger, know it is dangerous, and have afforded a third-party an opportunity for harm—an opportunity that would not otherwise have existed. *Id.* at 538 (citing *Piotrowski v. City of Houston*, 237 F.3d 567, 585 (5th Cir. 2001)). While articulating its parameters, the Fifth Circuit has repeatedly stated that it has not recognized the state-created danger theory as viable. *Id.* at 537. *See also, Doe v. Covington County School Dist.*, *supra* at 863-67; *Kovacic v. Villareal*, 628 F.3d 209, 214 (5th Cir. 2010). Ruiz acknowledges this state of the law. D.E. 29, p. 7.

Still, Ruiz argues that the earlier *McClendon* case supports the imposition of liability if the facts justify its application. In *McClendon*, the Fifth Circuit recites, "we have not yet determined whether a state official has a similar duty to protect individuals from state-created dangers."[5] *Id.* at 325. Ruiz argues that this case involves the precise fact pattern necessary for imposing a duty for state-created danger for the first time.

However, when the *McClendon* opinion notes that it has not confronted a set of facts that justify imposition of the state-created danger theory, it says this in the context of the *DeShaney* facts. The Fifth Circuit notes, with emphasis, the portion of the

---

[5]   The *McClendon* opinion further notes that, to raise such a theory to constitutional proportions in the qualified immunity context, the existence of the right would have to be "defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct." *Id.* at 331. Ruiz argues that there has been sufficient consideration of the theory to place state actors on notice of its potential application to the facts here. To the contrary, because this theory was rejected in an opinion acknowledging the *DeShaney* fact pattern, state actors likely would not be expected to anticipate its application here.

*DeShaney* opinion regarding the return of a child to an abusive parent that states, " '[w]hile the State may have been aware of the dangers that [the child] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them*.' "  *Id.* at 324 (quoting *DeShaney*, 489 U.S. at 201; emphasis in *McClendon*).  Clearly, the Fifth Circuit does not regard the type of facts alleged in this case as raising a cognizable claim of state-created danger.  Simply stated, and tragically so, Texas' own mother created his danger.

The Court GRANTS the Defendants' Second Amended Motion to Dismiss (D.E. 35) and the Defendants' Motion for Summary Judgment (D.E. 40) with respect to Ruiz's allegation of a constitutional violation based on the state-created danger theory.

### c.  Family Integrity

There is no question that the right to "family integrity" is an acknowledged constitutional right—"a form of liberty guaranteed by the due process clause of the Fourteenth Amendment."  *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir. 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208 (1972)).  The Defendants' Motion to Dismiss does not seek to eliminate Ruiz's claim to "family integrity" to the extent that it is stated as an affirmative claim.  Instead, they seek to eliminate any recovery on this claim by way of the assertion, and application, of their qualified immunity defense.  Thus the parameters of this liberty interest must be explored in order to determine whether Ruiz has pled a violation of the right of family integrity with sufficient specificity to survive the requirements of "clearly established" law with respect to qualified immunity.

The family integrity liberty interest inures to the benefit of all three family members—the mother as well as father and child.  It informs the means, manner, and timing of action taken by social workers called upon to protect a child at risk of abuse.  It has been described as "nebulous"[6] because it involves a continuum.  On one side of the continuum is the basic civil right "far more precious than property rights" of the parents to the custody, care, and nurture of their child.  *Stanley*, 405 U.S. 651.  The Fifth Circuit has described it as the "most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state."  *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988) (quoting *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977)).

On the other end of the continuum is the State's clear prerogative to adopt "necessary policies to protect the health, safety, and welfare of children."  *Morris, supra* at 669, 671.

> When the facts of a case place it in the center of the continuum where the two interests overlap and create a tension, the right to family integrity may properly be characterized as nebulous, and thus a defendant may claim the protection of qualified immunity. However, when the facts of a case place it squarely on the end of the continuum where the state's interest is negligible and where the family privacy right is well developed in jurisprudence from this circuit and the Supreme Court, a defendant's defense of qualified immunity, based on a claim that the right to family integrity was not clearly established, will fail.

*Id.* at 671.  *See also, Wooley v. City of Baton Rouge, supra* at 924.

---

[6]  *E.g., Brian T. v. Ward*, 212 F.3d 595 (5th Cir. 2000).

It is well-established that the state must tread lightly when confronting the right to family integrity. For that reason, the first step in a case involving allegations of child abuse is to find a way to keep the family together, using such things as counseling, parenting classes, and home visits to help parents better care for their children and to monitor progress. *See generally, Santosky v. Kramer*, 455 U.S. 745, 748, 102 S.Ct. 1388, 1392 (1982); Tex. Fam. Code § 263.102(e) (referring to 42 U.S.C. 629a). The state is not permitted to use the allegation of past neglect or abuse to justify refusing to provide the natural parents adequate procedural safeguards as they seek to enforce their right to present and future family integrity. *See generally, Santosky*, 455 U.S. at 753-54, 102 S.Ct. at 1395. "[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." *Id*. 455 U.S. at 760, 102 S.Ct. at 1398.

Clearly, Ruiz and Texas had a right to family integrity, as did Mother. What is not clear in the facts alleged here or in the law, is how the State was required to balance those competing rights against its duty to intervene to protect Texas when the facts appeared to place Texas' situation vis-à-vis Mother (and, for that matter, Ruiz) somewhere in the nebulous gray area of the continuum described above. The fact that the rights exist does not *ipso facto* establish what actions can, or must, be taken in order to act consistently with those rights under the circumstances. This is particularly problematic when we must evaluate the State's actions without the benefit of hindsight and consider its various tools, which include temporary removal, family placement, foster care, and permanent

termination of parental rights, along with various educational and therapeutic interventions and monitoring.

In the context of the Motions, the question is whether Ruiz has stated a claim based on relevant facts that can survive a qualified immunity defense.  As described above, the qualified immunity defense will protect Cadena and Arredondo from allegations of violation of constitutional rights if those constitutional rights were not "clearly established."   In other words, the Court must decide whether the family integrity right at issue is "defined with sufficient clarity to enable a reasonable official to assess the lawfulness of his conduct."  *McClendon, supra* at 331.

Defendants have admitted that there is such a thing as a viable claim regarding "family integrity" under the Fourteenth Amendment.  D.E. 35, pp. 11-12.  But that does not end the inquiry.  Defendants contend that Ruiz cannot satisfy the second prong:  the requirement that the specific family integrity right was "clearly established" when Cadena and Arredondo intervened in Texas' family.  Ruiz responds, in essence, that the clarity of the right violated is "abundantly clear" from his pleadings.  D.E. 29, p. 9; 49, p. 10.

Defendants cite a line of cases that refused to permit a "family integrity" allegation to defeat a qualified immunity defense because the right is not "clearly established," but "nebulous" or "amorphous."   D.E. 35, pp. 14-15 (citing *Hodorowski, supra* at 1217; *Frazier v. Bailey*, 957 F.2d 920, 931 (1st Cir. 1992); *Doe v. State of Louisiana*, 2 F.3d 1412, 1417 (5th Cir. 1993); *Kiser v. Garrett*, 67 F.3d 1166, 1172-73 (5th Cir. 1995); *Peters v. Lowrey*, 114 F.3d 1184, 1997 WL 255628, *4 (5th Cir. 1997) (*per*

28 / 32

*curiam*; addressing the viability of the family integrity claim as a pleading matter); *Burney v. Carrick*, 170 F.3d 183, 1999 WL 47014, *3 (5th Cir. 1999) (*per curiam*); *Morris, supra* at 671; *Brian T., supra* at *1; Doop v. Chapman, 211 Fed.Appx. 246, 2006 WL 3147323 (5th Cir. 2006) (*per curiam*).  To be "clearly established" so as to inform the "objective legal reasonableness" test of qualified immunity, "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *McClendon, supra* at 331.

Reading the record indulgently in favor of Ruiz, it appears that his theory of this case has two arguments.  The first argument is that the safety plan whereby Texas' possession was voluntarily transferred to the maternal grandfather was equivalent to the State taking exclusive custody of Texas and thereby becoming responsible for Texas' safety—either the proper execution of the safety plan by the maternal grandfather with only supervised visits by Mother or strict liability for Texas' safety once TDPRS intervened in any manner.  However, Ruiz does not supply the Court with any authority in fact or in law for treating a voluntary plan for a child's possession within a family as equivalent to a state's exclusive custody.  The *DeShaney* analysis prevents this Court from finding in favor of Ruiz on this argument.

Ruiz's second argument appears to be that Cadena and Arredondo were required to place Texas with him in order to maintain family integrity once Mother was identified as a danger.  Once again, Ruiz does not supply the Court with reason in fact or in law to consider it "objectively unreasonable" to fail or refuse to select him as Texas' appropriate

temporary caregiver.   The record that Ruiz has supplied indicates that (a) Mother complained that Ruiz was abusive; (b) Ruiz had left Texas with Mother without explanation, resulting in a court order allowing him only alternative weekend visitation; (c) Ruiz was angry, irate, impatient, and prone to violence with respect to his relationship with Mother and Texas; and (d) Ruiz had seen the bruising on Texas and had previously failed to act to protect Texas.

Bloodlines alone do not indicate who can best care for, and protect, a child.  Ruiz does not support his theory that he should have been "next in line" with any law or social-psychology that specifies that caseworkers must turn a child over to a noncustodial parent ("possessory conservator") when problems are identified with the custodial parent ("managing conservator").  While the law prefers to see biological parents appointed as possessory conservators, it also requires consideration of any history of past abuse and qualifies that preference with the admonition:   "unless [the court] finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or emotional welfare of the child."  TEX. FAM. CODE § 153.191.  *See also*, TEX. FAM. CODE § 153.004.

The summary judgment evidence shows, among other things, that:  (1) medical opinions were mixed as to whether Texas was suffering from abuse; (2) Mother had court-awarded custody and appeared to comply with the safety plan until late November, 2010; and (3) Ruiz had previously abandoned Texas, leaving him with Mother; was considered to have participated in the abuse by his own failure to protect; and displayed serious anger management problems in the course of the TDPRS involvement.

Ruiz has not supplied the Court with any authority to show the precise action required of Arredondo and Cadena triggered by that place on the continuum between family privacy and clear endangerment of the child where the facts of this case fall. Neither do the cases supply specific measures that can or cannot be taken at certain intervals on that continuum.  Consequently, Ruiz does not show that he or Texas had a clearly defined constitutional right that Cadena and Arredondo violated or that their conduct was "objectively unreasonable" under the circumstances.  Family relationships are as complex as the people who are in them.  Without the benefit of hindsight, it would not serve anyone in the community well to construct strict rules for the micromanaging of families and task a team of social workers with the "awesome power of the state" to enforce them without any professional discretion.

As noted, these child protective cases involve nebulously defined rights such that Ruiz has not demonstrated, and cannot show, that Cadena and Arredondo acted in a manner that all caseworkers would know was clearly unlawful.

> Our decision in *Hodorowski* reflects our understanding of the difficult and important decisions social workers such as Sanders face when trying to balance parental rights against the prospect that a child is in immediate danger. We have noted that "because an interest in family integrity 'must always be balanced against the governmental interest [in the health, education, and welfare of children as future citizens], it is difficult, if not impossible, for officials to know when they have violated "clearly established" law.'"   *Doe v. Louisiana*, 2 F.3d 1412, 1418 (5th Cir. 1993) (quoting *Frazier v. Bailey*, 957 F.2d 920, 929 (1st Cir. 1992)).

*Burney, supra*.  When, as here, the state actor must exercise discretion and the law does not prescribe or proscribe a particular action, "[t]he qualified immunity standard gives

ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quotations omitted).   Ruiz has failed to demonstrate that Arredondo and Cadena were "plainly incompetent" or "knowingly violated the law."

While there is a general right to family integrity that could support a cause of action under the right sequence of events, the Court finds that Ruiz has failed to articulate that Cadena or Arredondo's conduct crossed a clearly identified line that defines the contours and limits of that right under the circumstances of this case.   Because caseworkers are generally entitled to the defense of qualified immunity, the Court GRANTS the Defendants' Motion to Dismiss (D.E. 35) and GRANTS Defendants' Motion for Summary Judgment with respect to Ruiz's claim to damages for breach of the right to family integrity on his own behalf and on behalf of Texas.

## CONCLUSION

For the reasons set out above, the Court GRANTS the Defendants' Second Amended Motion to Dismiss (D.E. 35).  In addition, the Court GRANTS the Defendants' Motion for Summary Judgment (D.E. 40) on the basis of qualified immunity.

ORDERED this 28th day of October, 2013.

NELVA GONZALES RAMOS
UNITED STATES DISTRICT JUDGE